# 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉.

## HITE v. COMMONWEALTH.

### March 10th, 1892.

CRIMINAL PROCEEDINGS—*Burglary—Case at bar.*—Upon the evidence disclosed by the record and set forth in the opinion ;

HELD :

> The verdict of guilty of the offence charged against the prisoner is not only plainly contrary to the evidence, but is without evidence and must be set aside.

Error to judgment of circuit court of Brunswick county, rendered April 21st, 1891, affirming the judgment of county court of said county, rendered April 5th, 1891, whereby one Frank Hite, the plaintiff in error, was sentenced to confinement in the penitentiary for the term of ten years, in accordance with the verdict of the jury on a trial of an indictment against him for burglary. Opinion states the case.

*E. P. Buford,* for plaintiff in error.

*Attorney-General, R. Taylor Scott,* for commonwealth.

LACY, J., delivered the opinion of the court.

The plaintiff in error was indicted, tried and convicted of burglary, and sentenced to ten years' confinement in the penitentiary. The prisoner moved the trial court to set aside the verdict and grant him a new trial, because the said verdict is

contrary to the law and the evidence, which motion the court overruled, and this action of the said court is the sole ground of error assigned here. The trial court certified the facts proved; and the sole question for us to consider is whether, upon a consideration of the same, the verdict is without evidence, or plainly contrary to the evidence. It was proved at the trial that on the night of the 10th of December, 1890, about 11 o'clock at night, the door-bar of the front door of J. E. Trotter's house, in Brunswick county, was heard to fall to the floor. The noise thus made aroused the inmates of the house; and immediately upon the falling of the said bar the footsteps of some person running from said house were heard. Search was thereupon made that night, and it was ascertained that a trunk containing some clothing, several pounds of cheese, $80 in United States currency, and some hog-meat, all the property of Mr. B. J. Taylor, had been stolen and carried away out of said house. None of these stolen articles were found that night; but suspicion being aroused against the family of a negro man, James Michael, who resided about three-quarters of a mile from the said residence of J. E. Trotter, a son of Mr. B. J. Taylor, accompanied by a young man, Mr. Griffith, who was visiting at Mr. Trotter's, proceeded to the house of said James Michael about 2 o'clock of that night, and on arriving about ten or twelve feet of said Michael's house, being afraid to go nearer on account of a dog, heard several persons in conversation. They could not hear distinctly enough to understand what was said, but young Taylor recognized the voices as those of James Michael's two daughters, Hannah and Charlotte, both grown negro women, and one *John Boden*, a young negro man. They (Taylor and Griffith) both smelled the odor of the hog-meat being fried, which emanated from the house of said James Michael.

Next morning search was made by four intelligent and respectable white men about the premises for the stolen articles and evidence of the guilty parties. Immediately around the

house of Mr. Trotter the ground was so firm that no tracks could be made thereon. Within fifteen yards of the house the tracks of the person running from said house were found in a piece of ploughed ground. These were barefooted tracks of considerable length and size, and very peculiarly shaped, the little toes being unusually far back from the other toes. These tracks were measured and found to correspond in every respect with the tracks of John Boden, and were going in the direction the person was heard running on the previous night when the door-bar fell. Boden was required to put his foot on said tracks, and the fit was perfect, even to the correspondence of the little toes. He manifested a great reluctance to having the tracks and his feet thus compared, and on putting his feet in the tracks endeavored to spoil the tracks. At some greater distance from said house were also found the shoe-tracks of another person, which shoe-tracks were considerably smaller than the barefooted tracks. These tracks were not measured, but were variously estimated to have been made by shoes numbers 8, 9, or 10, and turned over at the heels, and one of the white men aforesaid, Mr. Epperson, with whom *the prisoner* had worked *some two years before,* and who had had occasion to closely examine the prisoner's tracks during that time, thought they were the prisoner's tracks. As stated, these tracks were not measured, and the size of the shoes that made them was a mere matter of opinion of the witnesses. It was proved that the prisoner, in wearing, turned his shoes over at the heels in the manner that the tracks indicated; that the shoes that made them were turned over. About a quarter of a mile from the house of Mr. Trotter the trunk of Mr. B. J. Taylor was found partially cut open, and it was ascertained that a silk dress, two shirts, two pair of drawers, and several pounds of cheese had been taken therefrom, but $80 in currency were not taken. The ground immediately around the trunk was sodden, and no foot-prints were visible; but within fifteen feet the ground had been recently ploughed, and the bare-footed and shoe-tracks

above described were seen going back and forth in the direction of and near to the trunk as the condition of the land would permit of an impression.

Julia Michael, a negro woman, wife of said James Michael, and mother of said Hannah and Charlotte, had been for some months in the employment of Mr. Taylor, and was fully aware of the whereabouts of all these articles. She was in the house on the night of *December 10, 1890,* when the alleged burglary occurred.

This woman and her two daughters, Hannah and Charlotte, and a small boy, George Michael, son of Hannah, were all examined as witnesses for the commonwealth. Julia testified that all the tracks, both the barefooted and shoe-tracks, were tracks of the prisoner, although the white gentleman abovementioned, who were also examined as witnesses for the commonwealth, testified that the shoe-tracks were considerably smaller than the barefooted tracks.

Hannah testified that on the night of the *10th of December, 1890,* John Boden was in the house of her father, James Michael, all night with her and her sister, Charlotte; that she knew this because her baby was sick, and she was awake all night attending it; that Boden slept the first part of the night on her bed, and the residue on a pallet on the floor; that there was no meat fried in James Michael's house during that night except for the supper of the family, which was about sunset, and a small piece in the early part of the night for the prisoner, who was a son-in-law of the said James Michael, and was there on a visit that night; that this was all the meat the family had; that the prisoner about 10 o'clock took his departure from the house, after eating the piece of meat fried for him as aforesaid, declaring to her, Charlotte, and her son, George, that he intended to go to Mr. B. J. Taylor's and steal his meat, trunk, *money,* and other articles, and his gun by the bureau; that on leaving, the prisoner took with him a bag, a knife belonging to Jim Boden, that was on the mantle-piece,

and a cap belonging to one of her children, giving as a reason for taking it that if he should be seen he would not be recognized with a cap on; that Boden had returned previous to the prisoner's departure, and was asleep at the time.

The prisoner was found wearing this cap when arrested for this offence in Sussex county, and it was produced in evidence by the sheriff of this county, who made the arrest, and who was examined as a witness.

Charlotte and George testified that the prisoner made the declaration of his intention to steal Mr. Taylor's property as mentioned by Hannah. Charlotte also testified that the prisoner said that he knew the position of the several stolen articles in Mr. Trotter's house as well as she did, after having questioned her closely as to their position. None of the witnesses saw fit to apprise any member of Mr. Taylor's family of these threats of the prisoner.

Charlotte and George testified that after the prisoner left they both slept all night, and there was no conversation between any of them and Boden during that night. These witnesses (Hannah, Charlotte, and George Michael) were examined, and testified as above set forth *before the conversation* between Hannah, Charlotte, and James Michael and John Boden and *the frying of the meat* at 2 o'clock that night *had been proved.* It was proved that Charlotte Michael had been, on the afternoon of *December 10th, 1890,* at the said house of J. E. Trotter, assisting a daughter of Mr. Taylor in cutting out a dress; that both she and her mother, Julia Michael, were perfectly familiar with the whereabouts of all the stolen articles and some of the contents of the trunk; that *she wears No. 7 shoes, and her present shoes are turned over at the heel.*

George Michael testified that the prisoner sent John Boden a message by witness, asking him to go abroad with him that night, but *Boden* declined. It was further proved that the prisoner had been living in other counties of the state for more than a year, and had not been seen in the vicinity of Mr. Trot-

ter's house by any member of the household during that time. It was also proved that at the January term, 1891, of this court *John Boden* was indicted and tried for this offence, charged in the indictment in this case, and convicted by the jury and sentenced by the court to a term of five years in the penitentiary, where he now is; that on the trial of Boden, Hannah and George Michael testified in his behalf substantially as above set forth, with this exception, that they stated on Boden's trial that Frank Hite, the prisoner, said, on leaving the house of James Michael, on the night of December 10th, 1890, that " he intended to have some meat before he went to bed." They said nothing about his intention to steal the articles of Mr. Taylor, above-mentioned, in their testimony in that case.

A bed-room, a sitting-room and a closet in the house of Mr. Trotter were occupied by Mr. B. J. Taylor and his family. The sitting-room is in rear of the bed-room, and the closet in rear of the sitting-room. The meat was in the closet, and the trunk was in the bed-room. The closet had one window, which was closed by a blind, supported by a fence-rail. On the evening of December 10th, 1890, about sunset, this window was observed to be closed; next morning the rail and blinds were down and the window open. There is also a door connecting this closet with the sitting-room. · This door does not appear to have been locked. The trunk was in the bed-room on the afternoon of said December 10th, but it was not proved whether it was in said room at the time when the family retired; the witness did not remember seeing it.

The bed-room had two windows, about four and one-half or five feet from the ground, closed with window-sashes, a pane or two of glass being broken out of one window. There was no evidence that either of these windows was open during the night, nor was there any evidence that any person had entered and carried the trunk out through the windows.

This room has also two doors, one connecting it with the sitting-room, and the other opening on the hall, which leads

to the front door of the house. This room was occupied that night by Mr. Taylor's son and Mr. Griffith, the two young men who went to the house of James Michael about 2 o'clock of said night and heard the conversation between said James Michael, Hannah Michael, Charlotte Michael and John Boden, and smelled the fried meat.

Before Mr. Taylor's family retired, which was about 10 o'clock of said night, these two doors of the bed-room, and the front door of the house, were all partially open, and the witnesses testified that the trunk might have been taken out of said room before they retired, without attracting their attention.

Previous to retiring, Mr. Taylor's son shut and fastened both of the doors of the bed-room, and when he was awakened after the falling of the door-bar, both doors were shut and fastened as he had fastened them on retiring. Neither of these doors could have been so fastened by persons outside of the room. The prisoner was arrested in Sussex county; but he had been in the county (Brunswick), and in the vicinity of Mr. Trotter's, during Christmas week, 1890. And the court certifies that these were all the facts proved. But it cannot be regarded as a certificate of facts proved, because many inconsistent facts appear in it. It is impossible that *Boden* could have been asleep all night in Michael's house, and yet to have made the tracks, as it is proved that he did make them that night near the Trotter house. It is impossible that no meat was fried in that Michael house after 10 o'clock, and then a small piece, and that meat should have been fried in that house at 2 o'clock that night. Two o'clock A. M. in December is in the night time. It is impossible that these inmates of the Michael house could have slept all night, and yet all been up at 2 o'clock in conversation over their cooking meat. It is a certificate of evidence, and from it, gleaning all there is concerning the prisoner, at 10 o'clock that night he told this much-contra-dicted witness, Hannah Michael, that he intended to go to Mr.

Taylor's and steal his meat, &c. But in the Boden trial Hite is represented as saying " he intended to have some meat before he went to bed." In this case he is represented as having already eaten meat at 10 o'clock at night. Admitting this to be true, by a fiction of the rule of decision that the plaintiff must admit it before he can have his writ of error considered, there is no other act whatever in the case to connect Hite with the crime charged in the indictment. He had the boy's cap; but the evidence shows that he was at Michael's house at Christmas, 1890, between the time of the commission of the offence and the trial of Boden.

The crime charged in the indictment was committed by Boden. He was caught, the meat found on him, and the tracks around the house brought to his door; and he was convicted, and is now in the penitentiary. These false statements, as the commonwealth has proved them to be, were made on the Boden trial to exculpate him by the woman with whom he was intimate. The prisoner was generally absent from the county of Brunswick, and is not by any other person seen in the county except at Christmas, after the offence had been long since perpetrated; and the single grain of truth in the whole, that he had on a cap, is not sufficient to raise a presumption of his guilt. The small shoe-tracks are not identified as his. Mr. Epperson had an impression of his tracks two years before, and thought they resembled them, but the evidence shows that they resemble the shoes of the woman Charlotte also. *She wore a No. 7 shoe, and her present shoes were turned down at the heels also.*

The jury found the prisoner guilty. The judge who presided at the trial refused to set the verdict aside, and the circuit court judge refused to grant a writ of error. We are mindful of the great weight to be accorded to these concurring circumstances, and if there were *any* circumstances connecting the plaintiff with the commission of the offence, we would hesitate to dis-

turb the action of the trial court; but it must be admitted that this verdict is not only plainly contrary to the evidence, but it is without evidence, and, in justice, it ought not to stand, and it must be set aside. The conviction cannot be sustained.

The judgment complained of and appealed from here must be reversed and annulled, and the case remanded for a new trial.

JUDGMENT REVERSED.